UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Mars Hill Media,

           Plaintiff,

    vs.

Petters Group Worldwide; Petters
Company, Inc.; Enchanted Family Buying
Company; Nationwide International
Resources, Inc.; Thomas Joseph Petters;
Robert Dean White; Deanna Coleman
(a/k/a/ Deanna Munson); Michael Catain;
Larry Reynolds; and John Does #1-10.

           Defendants

Court File No._____

**COMPLAINT**

---

    Plaintiff Mars Hill Media, by and through its attorneys, Zimmerman Reed,

P.L.L.P., for this Complaint against Defendants, states as follows:

## NATURE OF ACTION

    1.    Plaintiff Mars Hill Media brings this action against Defendants Petters

Group Worldwide LLC ("PGW"), Petters Company, Inc. ("PCI"); Nationwide

International Resources, Inc. ("NIR"); Enchanted Family Buying Company

("Enchanted"); Thomas J. Petters ("Petters"); Robert Dean White ("White"); Deanna

Coleman ("Coleman"); Michael Catain ("Catain"); and Larry Reynolds ("Reynolds")

(collectively, "Defendants") for their violations of the Racketeer Influenced and Corrupt

Organizations ("RICO") Act, as well as their violations of various other state and

common laws.

SCANNED
OCT 0 9 2008
U.S. DISTRICT COURT MPLS

2. Plaintiff has been severely injured in its business and property by a fraudulent scheme perpetuated by Defendants. This scheme has operated in secrecy since the mid-1990's and only recently came to light as a result of a federal criminal investigation into Defendants' misconduct. According to documents filed in connection with the ongoing federal investigation, the primary method by which Defendants effectuated the fraud scheme involved Petters, his employees and his associates creating fictitious documents and then providing these documents to brokers and current and potential investors as evidence that PCI was buying and selling substantial goods and merchandise which PCI would then resell. In many instances, funds from investors were sent directly to the purported supplier of the merchandise, often Defendants NIR or Enchanted. In turn, NIR or Enchanted directed the funds to PCI (less a commission) without any merchandise. Petters and other persons would then fraudulently pledge the non-existent goods and merchandise as security for the investments.

3. Plaintiff is a non-profit organization and has suffered devastating financial losses as a result of Defendants' racketeering and illegal scheme to defraud. Defendants targeted Plaintiff and illegally obtained Plaintiff's money by using agents who were trusted and known to the non-profit community.

4. Plaintiff was lured into providing funds to PCI, purportedly to facilitate the purchase and sale of large quantities of electronics and other goods. In exchange for its investment, Plaintiff was promised scheduled interest payments and the ability to withdraw its principal investment at any time with simple written notice. Unbeknownst to Plaintiff, the goods PCI professed to be purchasing and selling with Plaintiff's money

2

(and with which PCI purported to secure its investment) were a total fiction—they never existed at all. Defendant Petters merely pocketed Plaintiff's money or funneled it through his other, legitimate businesses.

## PARTIES

5. Plaintiff Mars Hill Media is a Minnesota non-profit corporation which maintains its principal place of business at 8085 Wayzata Blvd., Suite 100B, Golden Valley, MN 55426.

6. Defendant PGW is a limited liability company duly organized and existing under the laws of the State of Delaware. PGW maintains its principal place of business at 4400 Baker Road, Minnetonka, Minnesota 55343.

7. Defendant PCI is a corporation duly organized and existing under the laws of the State of Minnesota. PCI maintains its principal place of business at 4400 Baker Road, Minnetonka, Minnesota 55343.

8. Defendant NIR is a corporation duly organized and existing under the laws of the State of California. NIR maintains its principal place of business at 2346 Westwood Boulevard #6, Los Angeles, California 90064.

9. Defendant Enchanted is a corporation duly organized and existing under the laws of the State of Minnesota. Enchanted maintains its principal place of business at 701 West Highway 7, 2nd Floor, Excelsior, Minnesota 55331.

10. Defendant Petters is a Minnesota resident residing at 655 Bushaway Road, Wayzata, Minnesota 55391.

3

11.    Defendant Robert Dean White is a Minnesota resident residing at 538 Grace Street, Excelsior, Minnesota 55331.

12.    Defendant Deanna Coleman is a Minnesota resident and maintains an office from which she engaged in the complained of misconduct at 4400 Baker Road, Minnetonka, Minnesota 55343.

13.    Defendant Michael Catain is a Minnesota resident residing at 4550 Enchanted Point, Mound, Minnesota 55364.

14.    Defendant Larry Reynolds is a Nevada resident residing at 15 Castle Oaks Court, Las Vegas, Nevada.

15.    Defendants John Does 1-10 are individuals and business entities who, along with the named Defendants, participated in a conspiracy to defraud Plaintiff and convert its investments. They were active participants and beneficiaries of the fraud and other illegal actions described herein.

## JURISDICTION AND VENUE

16.    This action arises out of violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, (18 U.S.C. §§ 1961-1968 under §§ 1962(a), 1962(c) and 1962(d) of the Act). It also seeks to recover damages and other available relief for violations of the Minnesota Uniform Securities Act, (Minn. Stat. § 80A.68), Minnesota Consumer Fraud statutes (Minn. Stat. §§ 326F.69, 325D.13, and 325D.44), and for violations of common law claims of fraudulent inducement, conversion and unjust enrichment.

4

17.   The Court has jurisdiction over Plaintiff's federal claims under 28 U.S. C. §§ 1331 and 1337.   The Court has jurisdiction over Plaintiff's state and common law claims under 28 U.S.C. §1367 because those claims are so related to the federal claims that they form part of the same case or controversy.

18.   Venue is proper in this District under 15 U.SC. § 22 and 28 U.S.C. § 1391 because some Defendants reside, transact business, or are found within this District, and a significant part of the events giving rise to the claims asserted herein arose in this District.

19.   The activities of the Defendants as described herein involved contracts for the interstate sale of goods and the use of the interstate mail and wires.   Thus, the Defendants' activities were within the flow of, were intended to, and did have a substantial effect on the interstate commerce of the United States.

## FACTUAL BACKGROUND

### A. Defendants' Scheme to Defraud

20.   At all relevant times for purposes of this Complaint, Petters was the sole or principal Owner and Chief Executive Officer of PGW, Petters' global holding company. In addition, Petters was directly or indirectly the sole or principal owner of PCI, one of the numerous business enterprises Petters owned.

21.   On September 24, 2008, federal authorities executed search warrants on several individuals and businesses in an attempt to uncover evidence regarding the fraudulent scheme described in this Complaint.

22.   The ongoing federal criminal investigation into Defendants' misconduct is based on information obtained from Defendant Coleman, a government informant and former participant in Defendants' scheme. The unsealed information Coleman provided has finally brought Defendants' fraudulent scheme to light after more than ten years of secrecy, and forms the basis of Plaintiff's present complaint.

23.   Among other things, Coleman as a government informant has provided information that PCI is the venture capital arm of numerous Petters enterprises. The money raised by Petters through PCI is used by Petters for his other business ventures and to support his extravagant lifestyle.

24.   The fraudulent scheme was perpetrated by Petters, Coleman (PCI Vice President of Operations); White (former PCI officer and current consultant to PCI), Catain (Enchanted), Reynolds (NIR), and other persons. The scheme began in the mid 1990s.

25.   Petters solicited investors to invest substantial sums in PCI. To induce the investors to invest, the investors were advised funds would be secured by transactions. Unbeknownst to the investors, those transactions were fictitious. Investors were then provided with false documents relating to the purchase and resale of merchandise. The fraudulent documents purport to evidence PCI purchasing merchandise from vendors such as NIR, located in Los Angeles, California, and Enchanted, located in Excelsior, Minnesota. Additional purchase orders falsely detail PCI's sale of the same merchandise to stores such as BJ's Wholesale Club in Levittown, Pennsylvania and Sam's Club in Bentonville, Arkansas.

26.   The purchase orders and other documents in support of the transactions are entirely fabricated.  PCI does not in fact buy merchandise from NIR or Enchanted.  Nor does PCI sell merchandise as described in the purchase orders to BJ's Wholesale Club, Sam's Club or any other business.  Petters uses these document to induce investors to invest money in his scheme.

27.   On occasion, investors sought to wire funds directly to NIR and Enchanted as payment for the fictitious purchase orders that had been provided by Petters and others to the investors.  Reynolds (NIR) and Catain (Enchanted) have entered into agreements with Petters to receive these funds from investors and then send these funds to Petters, minus a percentage of the funds as compensation for their role in the scheme. This scheme deceived the investors into believing that PCI was actually reselling merchandise.  In fact, PCI was not reselling any merchandise.

28.   Coleman, PCI's Vice President of Operations, created false purchase orders and invoices related to the purchase of merchandise from NIR and Enchanted.  White, who remains a consultant to Petters, was responsible for creating the false purchase orders related to the fictitious sale of merchandise to BJ's Wholesale Club, Sam's Club, Costco, and Boscov's.

29.   Petters and others used the mail, FedEx, and interstate wire communications in furtherance of the scheme, by sending documents via mail and interstate commercial carrier, and communicating in interstate commerce via wire transfer, by email and telephone.

7

**B. Defendants' Fraud Against Plaintiff Mars Hill Media**

30. Plaintiff Mars Hill Media is a non-profit corporation specializing in various types of Christian media programming, including websites, books and other literature, and multimedia presentations.

31. On June 9, 2008, Mars Hill Media, along with three other non-profit organizations invested in PCI by entering into an interest-bearing $4,350,000 Promissory Note in favor of Fidelis Foundation ("Fidelis"). Fidelis served as an agent for Mars Hill Media and the other non-profit investors in executing the Note. Mars Hill Media's investment in the note was $800,000.

32. Mars Hill Media was introduced to the PCI investment opportunity years earlier by Frank Vennes ("Vennes"). Vennes is an entrepreneur and businessman with extensive business and personal contacts both in Minnesota and around the nation. Vennes, individually and as the head of various business entities, conducts lawful transactions involving the purchase and resale of merchandise including precious metals, gems and other types of goods.

33. Vennes also has extensive contacts in the Twin Cities non-profit community and is a major philanthropic donor to dozens of charities and Christian organizations. Defendants Petters, PGW and PCI used Vennes to gain access to investors within the non-profit community, including Plaintiff. Vennes asserts that he was at all times under the impression that all of the transactions underlying this complaint were legitimate and that he sincerely believed the documents provided by Petters to Plaintiff, through Vennes, were genuine. Vennes has maintained his complete

8

innocence of any wrongdoing in connection with Defendants' scheme.

34. Based upon the statements made by Petters, PGW, PCI and their employees and agents, as well as the representations made in the Promissory Note and accompanying Security Agreement, Plaintiff was led to believe that its investment was going to be used by PCI to purchase merchandise at a discounted price. PCI was then going to sell the merchandise to a retailer for a profit. Plaintiff and the other Fidelis investors were to receive a security interest in the merchandise in order to provide further protection for the investment. This arrangement was confirmed in Promissory Notes.

35. Specifically, the June 9, 2008 note in which Plaintiff invested documented the May 23, 2008 purchase of 3,200 LG side by side refrigerators for $4,785,760 and subsequent sale for $5,312,192 for a supposed profit of $526,432. The company from whom PCI purportedly purchased the refrigerators was blacked out on the PCI purchase order provided to the investors, though visible portions of the order as well as prior notes entered into by Plaintiff indicate that company was Enchanted. Similarly, the purported purchaser of the 3,200 refrigerators is blacked out, though visible portions and other data on the (fabricated) purchase order indicate that company was listed as Sam's Club.

36. It now clearly appears that this entire transaction was a fraud. As described in further detail below, to induce Plaintiff to execute the Promissory Note, agents and employees of Petters, PGW, PCI, and others, created documents and agreements that were entirely fictitious. In reality, no merchandise was ever purchased with Plaintiff's

9

money. Instead Petters, PGW and PCI took Plaintiff's investment and used it to fund

Petters' other business ventures and personally enrich the Defendants involved.

37. The June 9, 2008 Promissory Note, like all prior notes executed by PCI in

favor of Plaintiff, contained an explicit Security Agreement which purported to provide

complete protection for Plaintiff's investment.

38. Specifically, the Security Agreement granted Fidelis as agent for Plaintiff:

a security interest under Article 9 of the Uniform Commercial Code in the
following described property to secure payment of indebtedness owed to
Secured Party:

Merchandise as reflected or referred to in the Purchase Order
attached hereto as Exhibit A...

Any other merchandise which Debtor has or will acquire rights in or
use of to the extent funds advanced by the Secured Party has enabled
Debtor to acquire an interest in such merchandise; and

Any and all accounts receivables and proceeds which Debtor may
acquire through the disposal of such merchandise.

39. The Security Agreement further clearly stated, "All funds provided by the

Secured Party will be advanced towards the purchase of the merchandise described in

Exhibit A..."

40. The terms of the Security Agreement also required PCI to insure the

merchandise that was allegedly purchased in connection with Plaintiff's investments.

41. These promises and representations were false. Contrary to the promises

and representations of PCI, Petters and other described herein, Plaintiff's investments

were merely part of Petters, PGW and PCI's fraudulent scheme to obtain money to fund

Petters' other business ventures, to repay debt, and for the personal enrichment of

10

Petters and others. In reality, the merchandise that was supposed to secure Plaintiff's investments and the documents and transactions related to that merchandise were entirely fictitious.

42.   PGW, PCI, Petters, Enchanted, NIR and the other named and unnamed Defendants intentionally and knowingly participated in this fraudulent scheme. They formulated, executed, and directed the creation of false documents, and falsely represented facts material to the investment transactions as a part of this scheme.

43.   The June 9, 2008 Promissory Note was not the first investment Plaintiff made with PCI. Mars Hill Media has executed fundamentally similar Promissory Notes with PCI since January 2002. In all, PCI executed numerous promissory notes in favor of Plaintiff from 2002 to the present, each supported by merchandise transactions similar to those described in this complaint.

44.   Based on information obtained from the ongoing federal criminal investigation, all or nearly all of the merchandise transactions with which PCI solicited Plaintiff's investments from 2002 to the present were fictional. Upon the expiration of each note, PCI executed a new note in Plaintiff's favor. In true Ponzi scheme fashion, each time PCI executed a new note it paid the interest due on the old note, presumably with funds obtained from other investors.

45.   Each prior note PCI executed in Plaintiff's favor contained fundamentally the same false representations and complete fabrications contained in the June 9, 2008 note.

11

46.     Plaintiff, with each new note, typically reinvested its principal investment. Unbeknownst to Plaintiff, it appears most or all promissory notes it executed with PCI were based on merchandise transactions which were utterly and completely fabricated. Devastatingly, now that Defendants' decade-long pattern of fraud and racketeering has been exposed, Mars Hill Media's $800,000 investment has vanished along with all interest currently owing to Plaintiff.

## COUNT I

## VIOLATION OF §1962(c) OF THE RICO ACT 18 U.S.C. §§ 1961-1968

47.     Plaintiff incorporates here by reference all preceding paragraphs.

48.     Section 1962(c) of the RICO Act makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

49.     As described herein, Defendants Petters, PGW (by and through its employees), and PCI (by and through its employees) each have operated, managed, and used individual enterprises, including: (1) Reynolds; (2) NIR; (3) Catain; (4) Enchanted; and (5) Frank Vennes.   In the alternative, Defendants Petters, PGW and PCI each operated and managed an association-in-fact enterprise with Reynolds, Catain, NIR and Enchanted.   Defendants Petters, PGW and PCI operated, managed, and used each of these enterprises to engage in a highly profitable pattern of illegal fraud in direct violation of § 1962(c).

12

50.   Reynolds, NIR, Catain, Enchanted and Vennes each, separately, are an "individual, partnership, corporation, association or other legal entity" and therefore constitute a cognizable enterprise under § 1961(4) of the RICO Act.

51.   Defendants Petters, PGW and PCI used Reynolds, NIR, Catain and Enchanted to create sham transactions to defraud investors, including Plaintiff. Defendants Petters, PGW and PCI used all of the enterprises individually to facilitate and carry out the pattern of racketeering activity which has injured Plaintiff.

52.   In addition, Defendants Petters, PGW and PCI used Vennes to gain access to and obtain funds from various investors, often through the various companies Vennes headed.

53.   In the case of Plaintiff, Petters, PGW and PCI used Vennes and his Metro Gem, Inc. ("Metro Gem") company. Metro Gem, which is owned and operated by Vennes, was named the "Servicing Agent" in all of the promissory notes executed between Plaintiff and PCI. Further, Metro Gem, which was known to and trusted by Plaintiff because of Vennes' ownership, was listed on a UCC Financing Statement attached to all of the promissory notes Plaintiff executed with PCI, including all notes described in this Complaint. Each of these UCC Financing Statements purported to be filed with the Minnesota Secretary of State and described the phony merchandise transaction associated with each promissory note. Thus, Petters, PGW and PCI were able to not only use Vennes to initially obtain Plaintiff's funds, but were able to use Vennes in connection with each false promissory note it executed to propel the fraud forward again and again from 2002 to the present. A recent government affidavit filed

13

in support of seizing the assets of numerous persons related to the scheme indicated that an informant (Coleman) disclosed to the government "that Petters and PCI have provided false documents via email to Vennes at his offices in Minnesota and Florida."

54.   The enterprises through which Defendants Petters, PGW and PCI engaged in their pattern of fraud were comprised of a consistent, ongoing structure of entities associated from the mid-1990's until the present day.  For example, fundamentally all of the fraudulent merchandise transactions underlying all of the notes entered into by Plaintiff from 2002 to the present involved phony purchases exclusively from NIR or Enchanted.  Similarly, Petters, PGW and PCI routinely used Vennes individually and through his associated entities, such as the Fidelis Foundation and Metro Gem, Inc., to access non-profit investors such as Plaintiff.

55.   Petters, PGW and PCI each played a significant role in operating and managing the enterprises described herein in connection with each predicate act, including Vennes, NIR and Enchanted and, in the alternative, the association in fact enterprises comprised of Petters, PGW, PCI with NIR and Enchanted.   In each fraudulent transaction described herein, Petters, PGW and PCI managed these enterprises by: (1) dictating the terms of and requiring the creation of false purchase orders by NIR and Enchanted; (2) providing Vennes with fraudulent documents and directing him to solicit and obtain investment money from investors, including Plaintiff; and (3) directing agents, employees and others on behalf of Petters, PGW, PCI, NIR and Enchanted to prepare false documents, convey false messages to investors, insurance companies, law firms, auditors and others to maintain the scheme's viability and

14

secrecy.   This direction, according to the criminal investigation, included (as an example only) directing: (1) Coleman, as Vice President of Operations for PCI, to create fictitious documents for PCI; (2) Reynolds as the head of NIR to arrange for representatives of insurance companies (insuring the fictitious goods) to tour warehouses of electronic goods owned by other companies, while representing that the goods were those sold to PCI; and (3) NIR (via Reynolds) to discourage auditors for investors from viewing the merchandise underlying the promissory notes by stating that the goods were in warehouses that were not accessible.

56.   The individual, fraudulent promissory notes carried out by Defendants Petters, PCI and PGW repeatedly over the past ten-plus years and described herein each individually constituted actionable mail and wire fraud and thus each constituted separate, but related, acts of racketeering actionable under the RICO Act.

57.   Specific instances of these acts of mail and wire fraud include the following:

a.   The June 9, 2008 Promissory Note described above was entirely false and fabricated in that it indicated and pledged as security the purchase of 3,200 LG refrigerators which never existed.  Petters, PGW and PCI caused this false representation to be sent via the United States mail to several recipients including Fidelis and Plaintiff.

b.   On December 13, 2007, PCI executed a promissory note in favor of Plaintiff in which Mars Hill Media invested $800,000.   The transaction underlying that note contained a purchase order indicating the

purchase of 2,225 Samsung LCD televisions from Enchanted for $4,661,931.25. The second purchase order attached to the December 13, 2007 note indicated a sale of these 2,225 televisions to a retailer for $5,174,727.00, for a profit of $512,795.75. The retailer purchaser of the televisions was blacked out on the (fabricated) purchase order, though visible portions and other data on the notes indicate the purchasing retailer was listed as Sam's Club. On information and belief, the transaction included in this note was entirely fabricated and false. Petters, PGW and PCI caused this false representation to be sent via the United States mail to several recipients including Fidelis and Plaintiff.

c. On August 20, 2007, PCI executed a promissory note in favor of Plaintiff in which Mars Hill Media invested $800,000. The transaction documents attached to that note included a purchase order indicating the purchase of 3,765 Samsung DLP televisions for $4,352,340.00 from Enchanted. Another purchase order document attached to that note indicated the sale of those televisions to Sam's Club for $4,831,097.40. On information and belief, the transaction included in this note was entirely fabricated and false. Petters, PGW and PCI caused this false representation to be sent via the United States mail to several recipients including Fidelis and Plaintiff.

d. On February 24, 2006, PCI executed a promissory note in favor of Plaintiff in which Mars Hill Media invested $775,000. The

16

transaction documents attached to that note included a purchase order indicating the purchase of a total of 10,940 JBL speaker systems $3,736,083.00 from NIR. Another purchase order document attached to that note indicated the sale of those televisions to BJ's Wholesale Club for $4,146,982.55. On information and belief, the transaction included in this note was entirely fabricated and false. Petters, PGW and PCI caused this false representation to be sent via the United States mail to several recipients including Fidelis and Plaintiff.

e.  On November 25, 2005, PCI executed a promissory note in favor of Plaintiff in which Mars Hill Media invested $800,000. The transaction documents attached to that note included a purchase order indicating the purchase of 3,650 Canon Digital SLR cameras for $3,691,975 from NIR. Another purchase order document attached to that note indicated the sale of those televisions to Boscov's for $$4,098,074. On information and belief, the transaction included in this note was entirely fabricated and false. Petters, PGW and PCI caused this false representation to be sent via the United States mail to several recipients including Fidelis and Plaintiff.

58.  Defendants Petters, PGW and PCI's predicate activity of mail and wire fraud described herein has been ongoing from approximately 1995 to the present day.

17

59.   Plaintiff Mars Hill Media suffered serious injury to its business and property in the form of its lost $800,000 investment and lost interest payments on that investment, which served as the predominant source of funding for its operations. Defendants Petters, PGW and PCI naturally, directly, and proximately caused these injuries by implementing their scheme to defraud and, using Vennes and other enterprises, inducing Plaintiff to invest in an opportunity which, unknown to Plaintiff, was a complete sham.

## COUNT II

### VIOLATION OF §1962(a) OF THE RICO ACT 18 U.S.C. §§ 1961-1968

60.   Plaintiff incorporates here by reference all preceding paragraphs.

61.   Section 1962(a) of the RICO Act states:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity… to invest, directly or indirectly, any part of such income or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

62.   Defendants Petters and PGW have illegally obtained significant amounts of money through the pattern of racketeering described in this Complaint, including some $800,000 from Mars Hill Media.

63.   According to documents in the ongoing federal criminal investigation, Petters funneled portions of these illegal proceeds through his legitimate businesses. Specifically, the federal documents aver, "The money raised by Petters through PCI is used by Petters for his other business ventures and to support his extravagant lifestyle."

18

64. Petters, both individually and by and through PGW, therefore directly violated §1962(a) of the RICO Act by investing the money obtained illegally by racketeering in Petters' other, purportedly legitimate, businesses. This funneling activity was purportedly done to "launder" the racketeering proceeds, including those proceeds illegally obtained from Plaintiff.

65. Plaintiff has suffered specific injury to its business and property as a result of Petters' and PGW's violation of § 1962(a). By this money laundering activity, these Defendants have deprived investors, including Mars Hill Media, of their principal investments and attempted to place that money outside the investors' reach should the scheme ever come to light.

66. Mars Hill Media invested $800,000 with PCI. On information and belief, Petters and PGW have taken Plaintiff's money out of PCI and funneled it through other Petters businesses, thereby effectively eliminating it from PCI's balance sheet and hiding it away from any claim by PCI investors. This violation of §1962(a) has naturally and proximately caused Mars Hill Media significant injury to its businesses and property.

## COUNT III

## VIOLATION OF §1962(d) OF THE RICO ACT 18 U.S.C. §§ 1961-1968

67. Plaintiff incorporates here by reference all preceding paragraphs.

68. Section 1962(d) states "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a)... or (c) of [18 U.S.C. §1962.]"

69. Defendants White, Coleman, Catain, Reynolds, NIR and Enchanted each are RICO conspirators and have violated §1962(d). Each of these Defendants both agreed to assist Petters, PGW and PCI commit violations of 18 U.S.C. §1962(c) and each committed overt acts of racketeering in furtherance of the scheme.

70. Unsealed information obtained from the ongoing federal criminal investigation indicates the agreement and overt acts by each of these individually named Defendants as follows:

**Defendant White**

71. According to the government, Defendant White, on a secret wiretap recording:

> admits that he, Coleman and Petters are 'co-conspirators' and that [White] maintains records related to the fraud scheme in an envelope that he at times keeps in his vehicle or takes home. White further describes the fraud scheme as a 'Ponzi scheme,' and estimates that at least $100 million of PCI's debt is fraudulent. White discusses cleaning out his office because he is worried.

72. Further, White used a laptop with access to the PCI network to prepare false invoices related to the fictitious purchases from Sam's Club and BJ's Wholesale Warehouse.

73. On October 8, 2008, Defendant White pled guilty to federal charges of mail fraud and illegal monetary transactions stemming from his role in creating and perpetuating the scheme described in this complaint.

**Defendant Coleman**

74.    Defendant Coleman's agreement to further the racketeering scheme was indicated by Defendant's White statement that he, Coleman and Petters are 'co-conspirators.'

75.    Coleman committed overt acts of racketeering by creating false purchase orders and invoices related to the purchase of merchandise from NIR and Enchanted.

76.    On October 8, 2008, Defendant Coleman pled guilty to federal charges of mail fraud and conspiracy stemming from her role in creating and perpetuating the scheme described in this complaint.

**Defendants Catain and Enchanted**

77.    The information obtained from the federal criminal investigation indicates that Catain is the sole operator of Enchanted, which operates out of a car wash in Excelsior, Minnesota.

78.    Further, a government informant formerly involved in the scheme indicated Enchanted has on more than one occasion received money directly from investors in payment of fraudulent purchase orders provided by PCI to investors. Enchanted did not provide any merchandise to PCI or its affiliated entities. Shortly after receiving the funds directly from the investors, Enchanted paid those funds over to Petters and PCI.

79.    The government informant further indicated that several years ago, Catain stated he was no longer in the business of selling merchandise to PCI. However, the fabricated documents provided by the government informant and Plaintiff's records indicate that Enchanted still annually buys and sells tens of millions of dollars of

electronic merchandise.   In a six month period in 2008, PCI purportedly bought $23,142,459.50 in electronic goods from Enchanted that PCI then resold to Sam's Club. Sam's Club has denied the validity of similar purchase orders presented to it for authentication by federal agents.

**Defendants Reynolds and NIR**

80.   In government wiretap recordings, Reynolds admitted to his participation in the fraudulent scheme described in this complaint.   Further, government analysis of wiretap recordings has confirmed Reynolds' and NIR's receipt of substantial sums of money as a result of the fraud.

81.   Unsealed information in the federal criminal investigation indicates Defendant Reynolds, a managing employee of NIR, has admitted Petters told him about the fake purchase orders, and that Reynolds has known about the illegal scheme for many years.   Reynolds further estimated the amount of the fraud to be in excess of $2 billion.

82.   Additionally, a government informant indicated that Reynolds acts as a conduit for funds provided by investors directly to NIR, which Reynolds then delivers to PCI and Petters, less a percentage as a commission.

83.   At Petters' request, Reynolds meets with and speaks to PCI's investors, falsely representing that his company is selling PCI large amounts of merchandise as depicted in the fictitious purchase orders.

84.   Reynolds has arranged for representatives of insurance companies (insuring the fictitious goods) to tour warehouses of electronic goods owned by other companies, while representing that the goods are those sold to PCI.

85.   Reynolds has discouraged investors' auditors from viewing the merchandise by stating that the goods were in warehouses that were inaccessible.

86.   The agreement to further the scheme of racketeering and overt acts in furtherance by White, Coleman, Catain, Reynolds, NIR and Enchanted has caused Plaintiff to suffer significant injury to its business and property. These violations of §1962(d) have naturally and proximately caused Plaintiff significant injury to its business and property.

## COUNT IV

## VIOLATIONS OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT MINN. STAT. § 326F.69

87.   Plaintiff incorporates here by reference all preceding paragraphs.

88.   Minn. Stat. § 325F.69, subd. 1 provides:

The act, use or employment by any persons of any fraud, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

89.   Petters, PCI, PGW, Enchanted, NIR, and the other named and unnamed Defendants engaged in deceptive practices and made statements and representations to Plaintiff that led Plaintiff to believe that, if it purchased a promissory note with its investment funds, those funds would be used by PCI to purchase inventories of

merchandise that would be resold at a substantial profit. PCI represented to Plaintiff that retail stores had already agreed to purchase the inventories for a price much higher than PCI had paid to acquire it, and that Plaintiff would receive a security interest in the inventory that PCI had purchased.

90. However, the security interest never vested because there was no inventory to use as collateral. Furthermore, retail stores had not in fact promised to pay a higher price for the purported inventory. PCI had fabricated both the inventory and the retail purchase orders.

91. The particulars of the representations and payment-inducing conduct are described above.

92. Defendants NIR, Enchanted and the other named and unnamed Defendants are subject to liability under Minnesota's consumer protection statutes because they were generally aware that Petters, PCI, and PGW were involved in the solicitation of funds for the fraudulent promissory notes, they were participating in the scheme and acquiescing in the transactions, and they were assisting Petters, PCI, and PGW in the perpetuation and execution of the violative conduct. Defendants NIR, Enchanted and the other named and unnamed Defendants were in a position to do something about the promissory note scheme, but instead did nothing but profit from it.

93. The merchandise at issue for purposes of this consumer protection count is not the inventory itself, but rather the promissory notes purportedly secured by the inventory, which fall within the meaning of "merchandise" under Minn. Stat. § 325F.68, subd. 2. Plaintiff was the "end-user," i.e. the ultimate consumer, of Defendants'

purportedly secured promissory notes, and its level of sophistication is irrelevant under Minnesota's consumer protection statutes.

94.   The success of this lawsuit will benefit the relevant purchasing public because (1) Defendants' conduct violated and violates the laws enumerated in Minn. Stat. § 8.31, subdivision 1, (2) Defendants' conduct and representations targeted many investors in the public at large, and (3) successful prosecution of the claims advances state interests, even if the group of persons joining to seek damages is smaller than the targeted group.

95.   Defendants' materially deceptive conduct and misrepresentations caused Plaintiff to purchase Defendants' promissory notes and as a result have caused Plaintiff to suffer damages that not only include the loss of guaranteed returns on its investment and the loss of substantial portions, or all, of its investment principal, but also include, without limitation, consequential and incidental damages.

96.   As a direct, proximate and foreseeable result of Defendants' conduct, Plaintiff sustained damages and is entitled to injunctive and equitable relief, including but not limited to restitution and disgorgement, and an award of attorneys' fees pursuant to Minn. Stat. § 8.31, subd. 3a.

## COUNT V

## VIOLATIONS OF MINNESOTA UNLAWFUL TRADE PRACTICES ACT MINN. STAT. § 325D.13

97.   Plaintiff incorporates here by reference all preceding paragraphs.

98.   Minnesota Statute § 325D.13 provides: "No person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise."

99.   Defendants' acts and practices regarding its sale and participation in the sale of promissory notes to Plaintiff constitutes unlawful trade practices in violation of Minn. Stat. § 325D.13 because Defendants misrepresented the true quality of such products. Defendants promised that the notes would be secured by inventories of goods that did not exist and which no retail stores had agreed to purchase at a higher, or any, price.

100. Defendants' materially deceptive conduct and misrepresentations caused Plaintiff to purchase PCI's promissory notes and as a result have caused Plaintiff to suffer damages that not only include the loss of guaranteed returns on its investment and the loss of substantial portions, or all, of its investment principal, but also include, without limitation, consequential and incidental damages.

101. Defendants' conduct described herein constitutes a violation of Minnesota's Unlawful Trade Practices Act, Minn. Stat. § 325D.13 injuring Plaintiff and entitling it to damages, injunctive and equitable relief, including but not limited to, restitution and disgorgement and an award of attorneys' fees pursuant to Minn. Stat. § 8.31, subd. 3a.

## COUNT VI

## VIOLATIONS OF MINNESOTA DECEPTIVE TRADE PRACTICES ACT
## MINN. STAT. § 325D.44

102. Plaintiff incorporates here by reference all preceding paragraphs.

103. Minnesota Statutes § 325D.44, subd. 1 provides:

> A person engages in a deceptive trade practice when, in the
> course of business, vocation, or occupation, the person:

>> ...(5) Represents that goods or services
>> have...characteristics, ingredients, uses,
>> benefits...that they do not have;

>> ...(7) Represents that goods or services are of
>> a particular standard, quality, or grade,...if
>> they are of another...

>> ...(9) Advertises goods or services with the
>> intent not to sell them as advertised;

>> ...(13) Engages in any other conduct which
>> similarly creates a likelihood of confusion or
>> of misunderstanding.

104. By engaging in the conduct described herein, Defendants violated and continue to violate Minn. Stat. § 325D.44.

105. PCI's acts and practices regarding its sale of promissory notes to Plaintiff amounts to wrongful conduct and misrepresentation of the true characteristics, standards, quality, and grade of its promissory notes:

a. Defendants represented that its promissory notes had characteristics, ingredients, uses, benefits that they did not have, namely that they were secured by inventory acquirable by Defendants and that retail stores had promised to purchase such inventory at a substantially higher price than was available to Defendants;

27

b.    Defendants represented that its promissory notes were of a particular standard, quality, or grade, when they were of another, in that there was no inventory available to act as security and that no retail stores had promised to purchase such inventory at a substantially higher price than was available to Defendants;

c.    Defendants advertised its promissory notes with the intent not to sell them as advertised, in that the promissory notes were not secured by inventory and the inventory would not be sold to retailers as advertised;

d.    Defendants' conduct created a likelihood of confusion and misunderstanding because of their blatant, materially false statements as detailed above.

106. As a result of Defendants' practices relating to the sale of promissory notes, Plaintiff has suffered actual harm and will continue to suffer actual harm.

107. Because Defendants willfully engaged in such trade practices knowing them to be deceptive, Plaintiff is entitled to recover its costs and attorneys' fees under Minn. Stat. § 325D.45, subd. 2.

## COUNT VII

### VIOLATIONS OF MINNESOTA UNIFORM SECURITIES ACT
### MINN. STAT § 80A.68

108. Plaintiff incorporates here by reference all preceding paragraphs.

109. Defendants' scheme involved the purchase and sale of a security.

110. Defendants employed a scheme to defraud Mars Hill Media out of $800,000 under the guise of a security interest in merchandise that never existed.

111. Defendants made numerous untrue statements of material fact as set forth above in order to execute and proceed with the June 9, 2008 Promissory Note.

112. As set forth above, Defendants engaged in acts and a course of business

28

that operated as a fraud or deceit upon Plaintiff.

113. As a result of Defendants' fraudulent conduct, Mars Hill Media has suffered actual damages in an amount to be determined at trial, but in excess of $800,000 plus interest, costs and attorneys' fees.

## COUNT VIII

## FRAUDULENT INDUCEMENT

114. Plaintiff incorporates here by reference all preceding paragraphs.

115. As described more fully in the preceding paragraphs. Defendants and agents of Defendants made material misrepresentations to Plaintiff.

116. The statements and representations by Defendants were materially false at the time they were made, were made with reckless disregard as to their truth or falsity, or were made without the present intent to perform them.  In particular Defendants knew or should have known for all of the transactions described above:

        a. There was no inventory to secure any of the transactions supporting the notes PCI executed in favor of Plaintiff;

        b. There was no retail purchaser for any of the merchandise described in the transaction documents attached to the promissory notes;

        c. The invoices reflecting the purchases from NIR and Enchanted were fraudulent; and

        d. The invoices reflecting the sales to Sam's Club, BJ's Wholesale Club, Boscov's and others were fraudulent.

117. Defendants secretly used Plaintiff's funds for purposes contrary to the promissory notes executed by PCI.

118. The statements and representations made by Defendants were intended so that Plaintiff would rely upon them to execute the promissory notes described herein and proceed with it after questions arose later.

119. Plaintiff reasonably relied on Defendants' representations described herein to its detriment. Plaintiff would not have entered into the promissory notes described herein absent such representations.

120. These fraudulent misrepresentations directly induced Plaintiff to execute the promissory notes described herein. Accordingly, Mars Hill Media has been damaged in an amount to be proven at trial, but in excess of $800,000, plus interest, costs and attorneys' fees.

## COUNT IX

## CONVERSION

121. Plaintiff incorporates here by reference all preceding paragraphs.

122. Plaintiff invested money in PCI and executed a promissory note on June 9, 2008.

123. Petters, PGW, and PCI, through their intentionally fraudulent acts, wrongfully converted Plaintiff's investments for their own benefit, and to the detriment of Plaintiff.

124. Plaintiff never had knowledge of, nor did they consent to, this conversion.

125. As a result of Defendants' actions. Plaintiff has sustained damages in an amount to be determined at trial, but in excess of $800,000 plus interest, costs and attorneys' fees.

## COUNT X

## ACCOUNTING

126. Plaintiff incorporates here by reference all preceding paragraphs.

127. To protect Plaintiff, it is necessary for Petters, PGW and PCI to provide an accounting of all funds transferred from any accounts of PCI sufficient for Plaintiff to determine the purpose and recipients of all such transfers.

## COUNT XI

## UNJUST ENRICHMENT

128. Plaintiff incorporates here by reference all preceding paragraphs.

129. Defendants have been unjustly enriched by obtaining Plaintiff's money through unlawful means.

130. Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred by such ill-gotten income.

131. Plaintiff seeks disgorgement of all of monies Defendants have obtained or derived from Plaintiff's investment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief against Defendants as follows:

1.  Award Plaintiff treble damages, costs and attorneys' fees as authorized by the RICO Act, 18 U.S.C. § 1964(c);

2.  Award Plaintiff all other direct and consequential damages as allowed by law;

3.  Award Plaintiff equitable and injunctive relief, including but not limited to restitution and disgorgement;

4.  Award Plaintiff costs and attorneys' fees against Defendants as otherwise allowed by law;

5.  Grant such other or further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated:  October 8, 2008.

**ZIMMERMAN REED, P.L.L.P.**

By _____

J. Gordon Rudd, Jr. (MN #222082)
Carolyn G. Anderson (MN #275712)
Brian C. Gudmundson (MN #336695)
Kirsten D. Hedberg (MN #344369)
651 Nicollet Mall, Suite 501
Minneapolis, MN  55402
T: 612.341.0400
F: 612.341.0844

**ATTORNEYS FOR PLAINTIFF
MARS HILL MEDIA**



ZIMMERMAN REED
ATTORNEYS AT LAW

RECEIVED
08 OCT -8 PM 4: 47
CLERK
MINNEAPOLIS

October 8, 2008

CAROLYN GLASS ANDERSON
ADMITTED IN MINNESOTA
cga@zimmreed.com

REPLY TO MINNEAPOLIS

*Via Hand Delivery*

Mr. Richard D. Sletten
Clerk of Court
U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

CC 50248

*RE:    Mars Hill Media v. Petters Group Worldwide, et al.*

Dear Mr. Sletten:

Enclosed for filing in the above-referenced matter, please find the following:

1)    Summons;
2)    Complaint; and
3)    Civil Cover Sheet.

Additionally, please find enclosed a check in the amount of $350.00, satisfying the filing fee.

Thank you for your assistance.  If you have any questions, please do not hesitate to contact me.

Very truly yours,

ZIMMERMAN REED, P.L.L.P.

Carolyn G. Anderson

CGA:kmc
Encl.

cc:    Mars Hill Media (via U.S. Mail)